**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CACTUS CORNER, LLC, a California
Limited Liability Corporation;
VENIDA PACKING COMPANY, a
California Corporation; CALIFORNIA
CITRUS MUTUAL; CALIFORNIA
GRAPE AND TREE FRUIT LEAGUE,
              *Plaintiffs-Appellants,*

v.

U.S. DEPARTMENT OF AGRICULTURE;
ANN M. VENEMAN, Secretary of
Agriculture; BOBBY R. ACORD,
Administrator, Animal and Plant
Health Inspection Service,
              *Defendants-Appellees,*

INTERCITRUS, a Spanish Trade
Association; IBERTRADE
COMMERCIAL CORPORATION, a New
York Corporation; LGS SPECIALTY
SALES, LTD., a New York "S"
Corporation; LUKE G. SEARS,
President of LGS Specialty Sales,
Ltd.,
  *Defendants-Intervenors-Appellees.*

No. 04-16003

D.C. No.
CV-02-06270-
OWW/SMS

OPINION

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, District Judge, Presiding

Argued and Submitted
March 15, 2006—San Francisco, California

Filed June 8, 2006

6371

Before: Pamela Ann Rymer, William A. Fletcher, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Clifton

**COUNSEL**

Roger M. Witten, Neil J. King (argued), Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for the plaintiffs-appellants.

Jan L. Kahn, Kahn, Soares & Conway, Hanford, California, for the plaintiffs-appellants.

Peter D. Keisler, McGregor W. Scott, Michael S. Raab, Teal Luthy Miller (argued), U.S. Department of Justice, Washington, D.C., for the defendants-appellees.

David A. Holzworth, Hiromi Maruyama, Lepon Holzworth & Kato, PLLC, Washington, D.C., for the intervenors-appellees.

---

**OPINION**

CLIFTON, Circuit Judge:

The Mediterranean fruit fly, widely known as the medfly, may be tiny — slightly smaller than a common housefly — but it carries enormous weight. It is widely regarded as one of the world's most destructive fruit pests. The medfly damages citrus and other fruits by planting eggs that hatch inside the fruit, and it reproduces rapidly: a female medfly can lay as many as 800 eggs during a lifetime of less than a month. The species originated in sub-Saharan Africa and is not established in the United States, except in Hawaii, which has been infested for nearly a century. The first U.S. mainland infestation was reported in Florida in 1929. Several infestations have been reported since then, especially in recent years, but intensive detection and eradication programs, notably in California, are believed to have prevented the pest from becoming permanently established.

The medfly is viewed as a serious threat to California's agricultural sector and general economy. California, the world's fifth largest agricultural economy, produces more than $13 billion worth of fruits and vegetables annually. Medfly infestation threatens that production, and an infestation would particularly hinder exports because other countries

often restrict imports from medfly-infested areas. Because many believe that California's recent medfly outbreaks have been caused by the importation of infested fruit, it is unsurprising that California growers are wary of fruit brought from other parts of the world. At the same time, there are those who believe that the growers' position is motivated as much or more by their desire to protect themselves against foreign competition in the multi-billion dollar domestic produce market.

It is within that context that this case arises. In 2001, medfly larvae were discovered in fruit imported from Spain, specifically in clementines, a variety of mandarin orange. The U.S. Department of Agriculture promptly halted further imports of clementines from Spain. Several months later, the USDA issued a rule that permitted the importation of Spanish clementines to resume, subject to certain conditions intended to prevent the introduction of medflies into this country. Domestic fruit growers challenged that rule by bringing this action. Spanish fruit growers intervened in support of the rule, and both sides filed motions for summary judgment. The district court granted summary judgment to the USDA, thus sustaining the rule against the domestic growers' challenge. *See Cactus Corner, LLC v. USDA*, 346 F. Supp. 2d 1075 (E.D. Cal. 2004).

This appeal requires us to consider which requirements administrative agencies must satisfy in decisionmaking. The domestic fruit grower plaintiffs urge us to require agencies to articulate explicit standards, quantitative or otherwise, that would then be used to guide the agency's decisionmaking process. Specifically, plaintiffs argue that the USDA must identify the level of risk it will accept in performing its duty "to prevent the introduction into the United States . . . of a plant pest," 7 U.S.C. § 7712(a), and that the department's failure to do so violated the Administrative Procedure Act ("APA"). We are not persuaded. Although a governmental agency must "articulate a satisfactory explanation for its

action including a rational connection between the facts found and the choice made," it need not define an explicit standard to guide its decisionmaking. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks and citation omitted). Because the government has "cogently explain[ed] why it has exercised its discretion in a given manner," *id.* at 48, we cannot conclude that the USDA's action in adopting the new rule was arbitrary and capricious. We also reject plaintiffs' argument that the USDA's factual determinations are not supported by the administrative record.

## I. BACKGROUND

The facts of this case are fully set forth in the district court's opinion, 346 F. Supp. 2d at 1081-92, and we summarize them briefly here. Until 2001, clementines were imported from Spain under a permit authorized by 7 C.F.R. § 319.56-2(e). The permit required that Spanish clementines be subjected to a cold treatment — storage at a specified cold temperature for a specified minimum period of time. The cold treatment was designed to kill any medfly larvae before they reached the United States. Importation continued without incident until November 2001, when consumers and agricultural officials discovered live medfly larvae in Spanish clementines at scattered locations around the country. *Id.* at 1081-82.

On December 5, 2001, the USDA's Animal and Plant Health Inspection Service ("APHIS") temporarily suspended the importation of Spanish clementines. The agency did so under the authority of the Plant Protection Act, which permits the Secretary of Agriculture to "prohibit or restrict the importation . . . of any plant . . . if the Secretary determines that the prohibition or restriction is necessary to prevent the introduction into the United States . . . of a plant pest." 7 U.S.C. § 7712(a). APHIS quickly assembled a team that visited Spain in mid-December. After identifying several possible causes for the appearance of medfly larvae, the team recommended

that a "systems approach" be adopted. 346 F. Supp. 2d at 1085. Under this approach, medflies would be subjected to multiple pest control measures, "at least two of which have an independent effect in mitigating" the risk of infestation. 7 U.S.C. § 7702(18) (defining "systems approach"); *see also id.* § 7712(e) (requiring the Secretary of Agriculture to conduct a study of "systems approaches designed to guard against the introduction of plant pathogens").

Because of concerns about the effectiveness of the cold treatment protocol, APHIS also convened a panel of experts to review the existing literature on the subject. The panel issued its findings on May 2, 2002. The panel concluded that the existing cold treatment protocol "does not provide 100% mortality, and even falls short of probit 9 security."[1] The panel therefore recommended revising the protocol by increasing "the required treatment time at each temperature by two days." For example, while the existing protocol only required 12 days of treatment at 34°F, the revised protocol called for 14 days at that temperature. In addition to recommending this immediate revision, the panel stressed the need for "long-term research plans . . . to verify the efficacy of the proposed new cold treatment parameters."

APHIS further analyzed the cold treatment protocols in a study prepared by its Office of Risk Assessment and Cost-Benefit Analysis ("ORACBA"). The ORACBA study provided a quantitative analysis of the effectiveness of cold treatment. The report agreed with the May 2002 study that the existing cold treatment protocol was inadequate, but concluded that the revised treatment protocol "should achieve the probit 9 level of security."

---

[1]Probit 9 "refers to a level or percentage of mortality of target pests (i.e., 99.9968 percent mortality or 32 survivors out of a million) caused by a control measure. APHIS has historically used the term 'probit 9' in association with the mortality rate caused by commodity treatments (including . . . cold treatments) for fruit flies." 67 Fed. Reg. 64702, 64704 (Oct. 21, 2002).

In addition to the cold treatment studies, APHIS prepared a risk management analysis, which provided a more comprehensive evaluation of medfly control measures. The agency released the final version on October 4, 2002. This analysis assisted the agency's decisionmaking process by estimating the likelihood that a mated pair of medflies could enter a region of the United States with a climate suitable for medfly populations. The agency focused on mated pairs because a single medfly cannot cause much damage. Unless a mated pair comes together in a suitable climate, there is little risk of infestation.

The risk management analysis evaluated the efficacy of the "systems approach," under which two independent pest control measures would be implemented. One was "the application of quarantine cold treatments such that probit 9 mortality is approximated," as described above. The other was a management program designed to limit medfly populations within Spanish orchards, prior to any cold treatment or shipment of clementines to the United States.

To determine the risk of medfly introduction, the risk management analysis used a five-variable model. These variables estimated (1) the number of clementines shipped from Spain; (2) the proportion of fruit infested with larvae; (3) the number of larvae per fruit that will develop into adults; (4) the mortality rate resulting from the revised cold treatment protocol; and (5) the proportion of fruit discarded in areas of the United States with medfly-suitable climates. After examining these variables, APHIS concluded that the proposed control measures would reduce the likelihood of medfly introduction to less than 0.0001, or "less than one in more than ten thousand years." Even at the 95% confidence level, the likelihood was only 0.0004, or "less than one in two thousand years."

Meanwhile, in July APHIS published a rule proposing that the importation of clementines be resumed. *See* 67 Fed. Reg. 45922 (July 11, 2002). APHIS solicited comments on the pro-

posal and held two public hearings. After evaluating these comments, and making revisions to the risk management analysis and the proposed treatment methods, APHIS issued the Final Rule. 67 Fed. Reg. 64702 (Oct. 21, 2002); *see also* 7 C.F.R. § 319.56-2jj. In promulgating the Final Rule, the agency expressly relied on the risk management analysis, the May 2002 panel review, the ORACBA study, and "the determinations of USDA technical experts." 67 Fed. Reg. at 64703.

The Final Rule follows the recommendations of the risk management analysis by implementing two major changes to the Spanish clementine program. First, the Final Rule mandates the use of the revised cold treatment protocol. 7 C.F.R. § 319.56-2jj(g). Second, the Final Rule requires that the Spanish government take aggressive steps, including an APHIS-approved management program, to reduce the medfly population in that country's orchards. *Id.* § 319.56-2jj(b)-(d). The Final Rule tests the efficacy of those efforts by requiring that 200 fruit from each shipment be sampled before the shipment undergoes cold treatment. *Id.* § 319.56-2jj(f). If, during this pre-treatment sampling, "inspectors find a single live Mediterranean fruit fly in any stage of development . . ., the entire shipment of clementines will be rejected." *Id.* In addition, if a single live medfly "is found in any two lots of fruit from the same orchard during the same shipping season, that orchard will be removed from the export program for the remainder of the shipping season." *Id.* The Rule also provides for the inspection of clementines at U.S. ports of entry. If any live medfly or medfly larvae are found during such an inspection, "the shipment will be held until an investigation is completed and appropriate remedial actions have been implemented." *Id.* § 319.56-2jj(h).

Plaintiffs filed suit in the Eastern District of California, arguing that the Final Rule violates the APA and other laws. After a group of Spanish clementine exporters intervened in support of APHIS and the Final Rule, both sides moved for

summary judgment. On March 11, 2004, the district court granted the agency's motion for summary judgment, 346 F. Supp. 2d at 1123, and plaintiffs timely appealed.

## II. DISCUSSION

Plaintiffs challenge the Final Rule on two grounds. First, they contend that APHIS improperly issued the Final Rule without defining what level of risk it would accept in "prevent[ing] the introduction" of medflies under the Plant Protection Act. Second, they argue that the agency's factual determinations are not supported by the record.

We review the district court's grant of summary judgment *de novo. Baccarat Fremont Developers, LLC v. U.S. Army Corps of Engineers*, 425 F.3d 1150, 1153 (9th Cir. 2005). We may set aside the agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). In our review under the APA, "we ask whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Baccarat Fremont*, 425 F.3d at 1153 (citing *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989)).

### A. *Articulation of an Acceptable Level of Risk*

Plaintiffs argue that the Final Rule violates the APA because the agency "simply declar[ed] that the measures it has adopted will 'prevent the introduction' of Medfly without explaining what criterion it applied to make that determination or why." According to plaintiffs, APHIS was obligated to identify the level of risk it considers to be unacceptable, and the agency's failure to do so requires that the Final Rule be set aside. In support of their argument, plaintiffs cite *Harlan Land Company v. USDA*, 186 F. Supp. 2d 1076 (E.D. Cal. 2001), as well as decisions relied on in *Harlan Land*, including *Ober v. Whitman*, 243 F.3d 1190, 1195 (9th Cir. 2001).

The court in *Harlan Land* overturned a similar rule because APHIS "did not establish a level above which the risk [of pest introduction] would no longer be negligible." *Id.* at 1080. *Harlan Land* thus suggests that APHIS was required to "provide a negligible risk threshold" before issuing the Final Rule. *Id.* at 1087.

[1] Plaintiffs' argument is foreclosed by our recent decision in *Ranchers Cattlemen Action Legal Fund v. USDA*, 415 F.3d 1078 (9th Cir. 2005). In *Ranchers Cattlemen*, we considered this issue in the context of the Animal Health Protection Act, which is substantively identical to the Plant Protection Act.[2] The district court in that case had relied on *Harlan Land* to enjoin a USDA rule permitting the importation of Canadian beef and cattle. The district court specifically held "that USDA failed adequately to quantify the risk of Canadian cattle to humans." *Id.* at 1091. The agency appealed, and we reversed.

[2] On appeal, we squarely rejected the premise of plaintiffs' argument, holding that the Animal Health Protection Act "does not require the Secretary to quantify a permissible level of risk or to conduct a risk assessment." *Id.* at 1097. We also emphasized the USDA's "wide discretion in dealing with the importation of plant and animal products," and we noted that

---

[2]The relevant language in the two statutes is nearly identical. Under the Animal Health Protection Act, the Secretary of Agriculture

> may prohibit or restrict . . . the importation . . . of any animal . . . if the Secretary determines that the prohibition or restriction is necessary to prevent the introduction into . . . the United States of any pest.

7 U.S.C. § 8303(a)(1). Under the Plant Protection Act, the Secretary

> may prohibit or restrict the importation . . . of any plant . . . if the Secretary determines that the prohibition or restriction is necessary to prevent the introduction into the United States . . . of a plant pest.

7 U.S.C. § 7712(a).

"the statute's use of the word 'may' suggests that [USDA] is given discretion over such decisions as whether to close the borders." *Id.* at 1094. In this case, where APHIS has issued a rule under a substantively identical statute, we follow our holding in *Ranchers Cattleman* and reject this point of appeal.

### B.   *APHIS's Factual Determinations*

Plaintiffs further argue that the administrative record does not support the factual determinations underlying the Final Rule. They have identified four problems with the agency's analysis which, plaintiffs contend, demonstrate that the Final Rule is arbitrary and capricious. We conclude that these objections are without merit.

**[3]** Plaintiffs first point out that the risk management analysis improperly presented four different estimates, varying by a large margin, for the probability that a mated pair of medflies will be introduced in a medfly-suitable region. These inconsistencies are not fatal to the Final Rule. The underlying data *are* consistent with the figures cited in the analysis's executive summary and with the agency's ultimate conclusions about the likelihood of medfly introduction. Because these discrepancies within the risk management analysis do not appear to have affected APHIS's final decision, we decline to overturn the regulation on this basis. *See Alaska Dep't of Environmental Conservation v. EPA*, 540 U.S. 461, 497 (2004) ("Even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned.") (quotation marks and citation omitted).

**[4]** Plaintiffs' second objection concerns the risk management analysis's estimate of eight as the maximum number of larvae per fruit that will lead to viable adults. Plaintiffs assert that this estimate is baseless because the agency's direct sampling in 2001 indicated that the average larvae per fruit varied between four and twelve. We are unpersuaded by this argu-

ment for two reasons. First, the estimate used in the risk management analysis is not equivalent to the figure cited by plaintiffs. The risk management analysis estimated the number of *viable larvae* (i.e., those that will reach adulthood), while the 2001 sampling data merely represents the number of *larvae observed*, without adjusting for larvae mortality. Although APHIS discovered clementines that contained as many as twelve larvae, only about 10% of those larvae would be expected to reach adulthood. Plaintiffs argue that this 90% mortality rate is offset by the fact that only 10% of larvae are detected, but the detection rate cited by plaintiffs is based on grapefruit data. Although the agency discussed this grapefruit data in the risk management analysis, APHIS never assumed that the detection rate for grapefruit is identical to the clementine's, a decision supported by the agency's observation that the characteristics of these fruits differ.[3] Indeed, elsewhere APHIS assumed that medflies are more easily detected in clementines than in grapefruit. *Compare* A.R. 1401 (citing a study in which only 35% of infested grapefruit were detected) *with* 67 Fed. Reg. at 64736 (assuming that 75% of infested clementines will be detected). In short, the 2001 sampling data does not support plaintiffs' claim that the maximum number of viable larvae is greater than eight.

[5] The second reason we reject plaintiffs' argument is that, even if the 2001 sampling data would support a different estimate than the one chosen, APHIS was within its discretion in using an alternative method to calculate this value. The agency relied on a 1999 study of clementines which suggested that the maximum survival rate for medfly larvae is less than 8%. Conservatively assuming that an infested clementine could contain up to 100 eggs, the risk management analysis estimated that the maximum number of viable larvae was eight. *See* A.R. 1402-03 ((100 eggs per fruit) x (maximum

---

[3]"We note . . . that clementines are smaller fruit than grapefruit and have therefore a much larger surface area to inspect. Clementines are also easier to dissect than grapefruit." A.R. 1401.

survival rate of .0765) = 8 viable larvae per fruit). Because we "defer to the evaluations of agencies when the evidence presents conflicting views," *Pacific Coast Federation of Fishermen's Associations v. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005), we reject this challenge to the Final Rule.

Third, plaintiffs maintain that the Final Rule's control measures cannot logically fix the medfly problem, because the infestation rate observed in 2001 was 0.16% while the Final Rule only protects against infestation rates greater than 1.5%.[4] Plaintiffs thus question how "[l]imiting the maximum infestation rate under the Rule to a value almost ten times higher than the infestation rate in 2001 would [ ] be expected to make a difference." But APHIS addressed this issue in the Final Rule, explaining that it was "unconvinced that the level of infestation observed in samples taken later in the shipping season are representative of" the infestation rates that existed earlier in the season. 67 Fed. Reg. at 64713. APHIS believed that the medfly infestation rates in Spain varied over the course of the 2001-2002 shipping season. The agency concluded that these rates were greater than 0.16% early in the season, when the first shipments reached American shores. It was within these early-season clementines, which were on the market by November 2001, that live medfly larvae were found. According to APHIS, by the time it began collecting data later that season, the infestation rates had fallen. Because "the infestations associated with early season shipments" were greater than 0.16%, APHIS chose not to rely on its sampling data in the risk management analysis. *Id.* at 64714.

---

[4]APHIS can detect infestation levels as low as 1.5% because the Final Rule requires that "APHIS inspectors [ ] cut and inspect 200 fruit that are randomly selected" from each shipment of clementines. 7 C.F.R. § 319.56-2jj(f). By sampling 200 fruit, there is a 95% probability that the agency will detect medfly larvae in shipments in which only 1.5% of the clementines are infested. 67 Fed. Reg. at 64712.

**[6]** The agency's assumption, that the early-season infestation rates exceeded 0.16%, is supported by empirical evidence, including the "higher than average trap captures" and "higher than average temperatures" that existed early in the season. *Id.* Because APHIS addressed plaintiffs' specific concern, and its selection of the target rate is otherwise defensible, we will not disturb the agency's judgment. *See Pacific Coast*, 426 F.3d at 1090 ("an agency must have discretion to rely on the reasonable opinions of its own qualified experts") (citation omitted).

**[7]** Fourth, Plaintiffs challenge the revised cold treatment protocol, arguing that APHIS was wrong to implement this protocol because the agency's experts could not validate the protocol's effectiveness. Although a panel of experts recommended further research in May 2002, APHIS subsequently conducted the ORACBA study, whose results demonstrated "a high degree of confidence" that the revised treatment protocol "should achieve the probit 9 level of security." Given the ORACBA results, APHIS's decision to implement the revised protocol did not "run[ ] counter to the evidence before the agency." *Id.* (citation omitted).

In their reply brief, plaintiffs argue for the first time that the ORACBA report does not support the risk management analysis's assumption that the revised protocol will result in probit 9 mortality. They contend that the ORACBA report only supports the use of an 18-day treatment, and that the report's conclusions regarding the 14-day treatment (which is permitted under the Final Rule) are inapplicable because ORACBA relied on a study of lemons, not clementines. This argument is without merit. Even assuming that plaintiffs could properly raise this issue in the reply brief, we decline plaintiffs' invitation to second-guess the agency. In promulgating the Final Rule, APHIS considered and addressed numerous comments pertaining to the revised cold treatment protocol, including concerns about the efficacy of treatments shorter than 18 days. *See, e.g.*, 67 Fed. Reg. at 64730-64733. The agency's

reliance on a study of lemons in devising the 14-day protocol was a discretionary judgment call to which we defer. *See Pacific Coast*, 426 F.3d at 1090.

## III. CONCLUSION

**[8]** Because APHIS was not required to define a negligible risk standard under the Plant Protection Act, and because the agency has "articulated a rational connection between the facts found and the choices made," *Ranchers Cattlemen*, 415 F.3d at 1093 (citation omitted), we conclude that the Final Rule is neither arbitrary nor capricious. The district court's grant of summary judgment in favor of the government was appropriate.

**AFFIRMED.**